PHILLIPS J. GOODENOUGH and MARGARET GOODENOUGH, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Goodenough v. Commissioner
Docket No. 4776-78.
United States Tax Court
T.C. Memo 1980-28; 1980 Tax Ct. Memo LEXIS 562; 39 T.C.M. (CCH) 972; T.C.M. (RIA) 80028; January 28, 1980, Filed Richard N. Rapoport, for the petitioners. Barbara Leonard, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: Respondent determined deficiencies in petitioners' 1973 income tax liability *563 in the amount of $3,779.00. After concessions by the parties, the only issue remaining is whether a loss arising from a loan on which petitioner was a co-maker must be treated as a business or a nonbusiness bad debt. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners, Phillips J. and Margaret Goodenough, husband and wife, filed a joint return for the taxable year 1973 with the Office of Internal Revenue Service at Fresno, California. At the time the petition herein was filed, petitioners resided in Alamo, California. Margaret Goodenough is a petitioner herein solely by reason of having filed a joint return. References to petitioner hereinafter are solely to Phillips J. Goodenough. For a period of at least five years prior to June 1970, petitioner was engaged as an employee of several auto dealerships, working in both sales and management. Petitioner established a good reputation for the management of automobile dealerships. Early in 1970, petitioner applied for and received a Datsun franchise for the city of Hayward. Two conditions were attached *564 by Nissan Motor Corporation to the receipt of this franchise: (1) that petitioner manage the dealership, and (2) that sufficient capital be invested for the operation of the dealership. In March of 1970, an agreement was reached among petitioner and two investors, Alan Baskin and James Habel. It was agreed that a corporation would be formed and that Baskin and Habel would provide the capital for the dealership. On May 19, 1970, the Hayward Corporation [hereinafter Hayward] was formed. Baskin and Habel contributed cash totaling $15,000.00 in exchange for 50 percent of the stock of Hayward. The original agreement called for petitioner to receive 25 percent of the stock of Hayward in exchange for a note in the amount of $7,500.00 payable to the corporation. Petitioner was then to have an option to purchase an additional 25 percent of the stock from the corporation. However, on July 1, 1970, petitioner executed two promissory notes totaling $15,000.00 payable to Hayward. The notes were in consideration for 50 percent of the stock to be issued by the corporation. On the same date, petitioner gave a security interest in his stock to Baskin and Habel in order to secure the *565 above-mentioned promissory notes. During June of 1970, Baskin and Habel contacted Republic National Bank [Republic] to obtain the financing required for the Hayward Datsun franchise. A demand note, dated June 15, 1970, for joint and several liability for payment of $50,000.00 was signed by Baskin, Habel and petitioner and given to Republic. Petitioner signed the note as co-maker because Republic believed that doing so would provide incentive for him to work harder in his efforts to make Hayward more successful. On June 15, 1970, Baskin, Habel and petitioner also signed a loan disbursement agreement, directing Republic to credit the account of Baskin with the $50,000.00. Republic carried out these instructions on June 16, 1970. On June 16, 1970, the $50,000.00 was transferred from Baskin's account to CDC International, Inc., [CDC] a corporation owned by Baskin and Habel. Pursuant to an employment agreement between Hayward Datsun and petitioner, dated July 1, 1970, petitioner was to be employed as president and general manager of Hayward for a minimum annual salary of $25,800.00 plus an annual bonus of 25 percent of the net operating profit of Hayward. This employment *566 agreement listed no date for the commencement of petitioner's services as manager. The agreement contained a provision whereby Hayward would repurchase petitioner's shares of stock in the corporation in the event petitioner's employment was terminated. On July 5, 1970, Baskin and Habel deposited two checks, one for $35,000.00 and one for $10,000.00, in the account of Hayward Datsun at Security Pacific National Bank. The $35,000 check bounced. At some later date, Baskin and Habel invested $33,000.00 in Hayward. Also on July 5, 1970, petitioner submitted a check in the amount of $14,000.00 to Nissan Motor Corporation. This amount was needed to cover an initial parts order. This check was immediately covered by Baskin to assure its negotiability. Thus, petitioner made no cash contribution to Hayward Corporation. Hayward opened its doors for business on July 5, 1970. However, due to problems of insufficient capitalization it was closed for a time. In September of 1970, petitioner found a new source for the capitalization of Hayward. Consequently, petitioner returned to Baskin and Habel the $33,000.00 in exchange for their stock in Hayward plus a release of the security *567 interest held by Baskin and Habel in the stock owned by petitioner. During October of 1970, Republic instituted a suit against Baskin, Habel and petitioner based upon their default on the $50,000.00 note. Sometime later but prior to petitioner's payment in settlement of the suit, Baskin was declared bankrupt. In December of 1973, petitioner settled his obligation with Republic by paying $10,063.00. Petitioner has not sought any recovery on this payment from either Baskin or Habel. On his 1973 tax return, petitioner deducted the $10,063.00 payment as a bad debt loss. Respondent disallowed the deduction on the grounds that the amount represented a nonbusiness bad debt. Respondent also argues that the payment did not represent a theft loss or a loss resulting from a loan guarantee. ULTIMATE FINDING OF FACT Petitioner signed the promissory note with a view toward securing his employment with Hayward Datsun.Thus, the payment made during 1973 in settlement of his obligations to Republic National Bank resulted in a business bad debt loss. OPINION The issue for decision is whether the petitioner sustained an ordinary loss as a result of his payment in 1973 of $10,063.00 *568 in settlement of a debt to Republic National Bank owed by petitioner and two others. Resolution of this question turns on whether that worthless obligation was a business or a nonbusiness bad debt within the meaning of sections 166(a) and (d) [1] and section 1.166-5, Income Tax Regs.
The issue is one of fact. There is no dispute that petitioner is entitled to a deduction under section 166 for the payment to Republic. Petitioner contends that the loss arising from his status as co-maker of the promissory note given to Republic constitutes a business bad debt within the ambit of section 166(a) and is ordinary in character. Alternatively, petitioner claims that the loss was a theft loss or a los on account of a guarantee. Respondent concedes the existence and amount of the payment on the debt, but maintains that petitioner's loss was a nonbusiness bad debt deductible under section 166(d) [2] as a short term capital loss.
*569 In determining whether a bad debt is a business or a nonbusiness obligation, the regulations focus on the relation the loss bears to the taxpayer's business. If the debt is created, or acquired in the course of the trade or business of the taxpayer, then the debt qualifies as a business bad debt regardless of the relationship of the debt to the trade or business of the taxpayer at the time it becomes worthless. Section 1.166-5(b)(1), Income Tax Regs. This determination is made in the same manner as the determination of whether a loss has been incurred in a trade or business for purposes of section 165(c)(1). A debt is deductible as a business bad debt if the creation of the debt was "proximately related" to the taxpayer's trade or business. Whipple v. Commissioner, 373 U.S. 193 (1963). Rendering service for pay as an employee is a trade or business for purposes of section 166. Trent v. Commissioner, 291 F.2d 669 (2nd Cir. 1961) revg. 34 T.C. 910 (1960). It is well recognized that a taxpayer may establish the requisite business nexus for deductibility of a bad debt under section 166(a) by proof that his dominant motivation in *570 incurring the debt was to protect his employment. U.S. v. Generes, 405 U.S. 93 (1972); Shinefeld v. Commissioner,65 T.C. 1092 (1976). In determining whether the services rendered a corporation constitute the conduct of a trade or business, the anticipated gain need not be realized immediately. Lundgren v. Commissioner, 376 F.2d 623, 628 (9th Cir. 1967), revg. 24 T.C.M. 1753, 1965 P-H TC Memo P65,314 (1965); Hirsch v. Commisioner, 315 F.2d 731, 736 (9th Cir. 1963). Thus, petitioner need not have been in present receipt of a salary at the time he incurred the debt in order for it to be related to his trade or business of being an employee. An employee-shareholder usually acts with two motivations, one to protect his investment and the other to protect his employment. The basic test is thus, whether petitioner incurred the liability primarily in order to obtain or to protect his employment as president and general manager of the Datsun agency, or as an investor in that business. We hold that petitioner was looking to his employment status within Hayward Datsun at the time he signed the agreement *571 as co-maker of the $50,000 loan. Thus, at the time he incurred the obligation which would later cause him to pay the $10,063.00 to the bank, petitioner was seeking to become the principal in the operation of a Datsun agency, and not merely an investor. Respondent contends that because petitioner had received no salary from Hayward at the time he signed the note, he was not an employee. However, petitioner had been devoting all his time to setting up Hayward Datsun. Petitioner had executed an employment agreement with Hayward. We find that petitioner was justified in his belief that once the franchise was capitalized, he would receive compensation for his services. We recognize that a loan motivated by one's status as an employee seems more plausible where its objective is to protect a present salary, rather than to promote a future one. Putoma Corp. v. Commissioner, 66 T.C. 652, 674 (1976), affd. 601 F.2d 764 (5th Cir. 1979). Nevertheless, we believe that the testimony indicates that petitioner set up Hayward predominantly in order to provide himself with a salary rather than appreciation in the value of his stock. Petitioner contributed none *572 of his own cash to the dealership. He received his stock in Hayward solely in exchange for promissory notes. The investment made by petitioner in order to put together the Hayward Datsun franchise was primarily one of his time, energy, and managerial skills. All his activities were performed with a view toward his employment with the corporation for a minimum annual salary of $25,800.00 plus 25 percent of the net profits of Hayward. His investment was a promise to pay and a promise to perform for the corporation. His potential salary exceeded his financial investment in the corporation. Petitionerhs management skills were important to the success of Hayward. His skills would increase the corporation's net worth which, in turn, would increase petitioner's salary. At the time petitioner signed the note to Republic he claimed a net worth of $71,976.00 while the other two investors claimed a net worth of $3,295,000.00 and $747,906.39. Clearly, the loan would never have been made to Hayward on the basis of petitioner's credit. He signed the note because of his position as manager and employee of Hayward. Because of our decision that the debt represents a business bad debt, we *573 need not decide the issues raised by petitioner's alternative claims. To reflect concessions made by the parties and the conclusion reached herein, Decision will be entered under Rule 155.
Footnotes
1. Statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. SEC. 166 BAD DEBTS. (d) Nonbusiness Debts- (1) General rule.-In the case of a taxpayer other than a corporation- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined.-For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩