WAYNE R. WEBER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Weber v. Commissioner
Docket No. 1950-92
United States Tax Court
T.C. Memo 1994-341; 1994 Tax Ct. Memo LEXIS 343; 68 T.C.M. (CCH) 172; July 25, 1994, Filed *343 Decision will be entered under Rule 155. For petitioner: Robert T. Gilleran. For respondent: Gregory Arnold, Mary P. Kimmel, and William A. McCarthy. MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: This case was assigned to Special Trial Judge Helen A. Buckley pursuant to section 7443A(b)(4) and Rules 180, 181, and 183. [1] The Court agrees with and adopts the opinion of the Special Trial Judge which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE BUCKLEY, Special Trial Judge: Respondent determined a deficiency in petitioner's Federal income tax for the taxable year 1983, together with additions to tax and increased interest, in the following amounts: Additions to Tax and Increased Interest Sec.
Sec.
Sec. Sec. Year
Deficiency
6653(a)(1)
6653(a)(2)
6661(a)
6621(c)
1983
$ 64,893.00
$ 3,244.65
[1]
$ 16,223.25
[2]
*344 Petitioner entered into a Stipulation of Settlement for Tax Shelter Adjustments with respect to Petro West, Inc., in which he conceded that he was not entitled to deduct a mining loss of $ 40,500, and that he was liable for additions to tax and increased interest pursuant to section 6653(a)(1) and (2), section 6661, and section 6621(c). At trial, petitioner also conceded that he was not entitled to deduct a mining loss from Soda Lake of $ 25,000. As a result of these concessions, [2] the issues remaining for decision are: (1) Whether petitioner is entitled to a business or nonbusiness bad debt deduction with respect to SAV Solar Systems; (2) whether petitioner is liable for additions to tax for negligence with respect to the bad debt deduction and the Soda Lake loss; (3) whether petitioner is liable for additions to tax under section 6661 with respect to the bad debt deduction and the Soda Lake mining loss; and (4) whether petitioner is liable for increased interest under section 6621(c) with respect to the Soda Lake mining loss. *345 FINDINGS OF FACT Some of the facts have been stipulated, and they are so found. The stipulation of facts and attached exhibits are incorporated herein by reference. Petitioner resided in Sherman Oaks, California, when the petition was filed in this case. Wayne R. Weber (petitioner) is a gynecologist who has been practicing medicine for 20 years. He did his medical internship in Denver, and his residency in Los Angeles at Kaiser Hospital. In the late 1970's, petitioner's friend, Jon M. Makeever, approached him about investing in a solar system business, SAV Solar Systems. At that time Makeever owned 50 percent of the business and his associate, Fred Rice, owned 50 percent. [3]
SAV Solar Systems was developing a solar device to be used for heating hot water for residences, based on technology developed by a New Zealand engineer. The unit, *346 placed on top of a home, would contain enough water heated by the sun to supply a home's hot water needs for one day. In 1977, petitioner loaned Makeever $ 2,500, presumably for SAV Solar Systems. This loan was evidenced by a letter of indebtedness from Makeever personally to petitioner. In January of 1978, Makeever wrote to petitioner praising the success and potential profitability of SAV Solar Systems. At that time Makeever predicted that the solar device would be introduced into the market in a matter of weeks. In addition, Makeever stated that he had received a letter of intent from a plumbing company to purchase 1,000 units during 1978. Because of SAV's increasing financial demands, he asked petitioner to make a "business investment" of $ 6,000. In exchange for the $ 6,000 investment, and other amounts previously contributed ($ 4,500), petitioner was to become a 10-percent owner of SAV Solar Systems. At that time petitioner was still practicing medicine full-time. On April 10, 1978, SAV Solar Systems was incorporated under the same name, SAV Solar Systems, Inc. (SSSI). According to the Articles of Incorporation, the following shares were issued and outstanding: Wayne Weber, M.D.
3,400
Jon M. Makeever
3,400
Fred Rice
1,700
Ricardo Espinosa, O.D.
1,500
*347 Makeever became president and chief financial officer, petitioner served as secretary, and Rice was chairman of the board. Petitioner and Makeever together owned nearly 70 percent of the outstanding stock. Petitioner paid an additional $ 10,000 to acquire his 3,400 shares of stock. [4] While the record does not indicate exactly how much petitioner invested in SSSI, he became financially involved at least in the amount of $ 20,000. On October 16, 1979, SSSI filed an application with the Small Business Administration (SBA) for a loan in the amount of $ 225,000. The loan was approved, and petitioner and Makeever signed the note for SSSI as president and secretary on March 5, 1980, wherein SSSI agreed to make principal and interest payments *348 of $ 2,838 each month, beginning in 6 months, for 10 years at 8 1/4-percent interest. In order for SSSI to receive the loan, the SBA required personal guarantees. Petitioner, Makeever, and Espinosa guaranteed the loan. To satisfy this obligation, petitioner pledged as collateral a deed of trust on real property he owned located in Manhattan Beach, California. Subsequently, petitioner sold the property in question and on March 1, 1981, he deposited $ 112,500 into a cash collateral account in place of the deed of trust to secure the loan. Petitioner guaranteed SSSI's loan because he felt it was a "flourishing business". In June of 1980, some 2 months after petitioner guaranteed the loan, petitioner terminated his medical practice to become involved in SSSI's day-to-day operations. In petitioner's view, his duties centered around his role as the "primary investor" of SSSI. He basically coordinated various aspects of the business, such as marketing and developing the solar unit. During this time petitioner continued to keep his medical license up to date, attended continuing education courses, and spent 1 day each month working in a medical practice. He did not receive a salary *349 from SSSI during this time. Petitioner returned to his medical practice full-time in mid-1982. The Small Business Administration loan agreement contained the following clause: Borrower will limit the total annual compensation (whether in the form of salaries, withdrawals, fees, bonuses, commissions, drawing accounts and/or other payments whether direct or indirect, in money, or otherwise) to the following named persons in the amount set opposite each respective name: Jon M. Makeever President $ 24,000.00
Petitioner did not receive a salary from SSSI. He lived solely on his savings during his tenure at SSSI. SSSI was financially unable to produce enough units to meet its demand. On November 10, 1981, SSSI (as Enray) [5] filed a petition for Chapter 7 liquidation in the U.S. Bankruptcy Court for the Central District of California. It did not survive bankruptcy. On November 12, 1981, petitioner received a letter from the Small Business Administration notifying him that SSSI's loan was in default (payments had not been made since May 1981); therefore, the entire balance was due immediately by petitioner. On August 12, 1983, petitioner paid half of the loan balance, *350 $ 112,500, out of his cash collateral account to the Small Business Administration. There was no possibility of recovery from SSSI; its obligation to petitioner was worthless. OPINION Petitioner contends that he is entitled to a bad debt deduction pursuant to section 166 with respect to his guaranty of a corporate obligation because he guaranteed the loan with "the dominant motivation of protecting his reasonable expectation of receiving a large salary" from SSSI. Further, he argues that he is not liable for any additions to tax because he conceded that he was not entitled to the Soda Lake mining loss. Respondent maintains that petitioner's guaranty was not made in connection with petitioner's trade or business; therefore he is not entitled to a business bad debt deduction under section 166. Rather, respondent agrees that petitioner is entitled to a nonbusiness bad debt deduction for the taxable year 1983. [6] We agree with respondent. *351 Petitioner bears the burden of proving that respondent's determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). I. Bad Debt Deduction. Section 166(a) provides that a taxpayer may deduct a bad debt in full in the year it becomes worthless. Under section 166, worthless business bad debts are fully deductible from ordinary income. On the other hand, worthless nonbusiness bad debts are treated as short-term capital losses. Secs. 166(d)(1)(B), 1222(2). A nonbusiness bad debt is defined in section 166(d)(2) as a debt other than: (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.
The worthless bad debts of noncorporate taxpayers that are created as a result of discharging liability as a guarantor of another's obligations are generally deductible as nonbusiness bad debts when the guarantee is entered into for profit, but not in connection with the taxpayer's trade or business. Sec. 1.166-9(a), Income Tax Regs. However, if such guarantee is made in *352 connection with the guarantor's trade or business, losses attributable to payments in satisfaction of the guarantee are deemed business bad debts and deductible as ordinary losses. Smartt v. Commissioner, T.C. Memo. 1993-65; Brooks v. Commissioner, T.C. Memo. 1990-259; sec. 1.166-9(a), Income Tax Regs. Whether a taxpayer is engaged in a trade or business is a question of fact. Dorminey v. Commissioner, 26 T.C. 940, 945 (1956). Whether a debt is considered a business or nonbusiness bad debt, the deduction is allowed for the year in which the guarantor actually pays the debt (or such later year as the right of subrogation becomes worthless). Petitioner paid the $ 112,500 in 1983. The taxpayer's motive is determined at the time the guarantee was made. Harsha v. United States, 590 F.2d 884 (10th Cir. 1979). A business bad debt deduction is unavailable unless the taxpayer can establish that (1) he was engaged in a trade or business, and (2) the acquisition or worthlessness of the debt was proximately related to the conduct of such trade or business. Id. *353 ; Putoma Corp. v. Commissioner, 66 T.C. 652 (1976), affd. 601 F.2d 734 (5th Cir. 1979); sec. 1.166-6(b), Income Tax Regs. To determine whether a particular guaranty is proximately related to the taxpayer's trade or business, we measure the taxpayer's dominant motivation for becoming a guarantor at the time of entering into the guaranty rather than the date upon which a payment in discharge is made. United States v. Generes, 405 U.S. 93, 104 (1972); French v. United States, 487 F.2d 1246 (1st Cir. 1973); Smartt v. Commissioner, supra. In determining the taxpayer's dominant motivation, we look at objective facts rather than subjective intent. Kelson v. United States, 503 F.2d 1291 (10th Cir. 1974). When a guarantor of a corporate debt is a shareholder and also an employee, mixed motives for the guaranty are often present, and the critical issue becomes which motive is dominant. United States v. Generes, supra at 100. Investing itself is not a trade or business, *354 but one's role as an employee is a business interest. Whipple v. Commissioner, 373 U.S. 193, 202 (1963). An employee's motive for guaranteeing a loan may be to protect one's employment or salary. From the record before us, it is apparent that petitioner has failed to establish that his guaranty was made in connection with his trade or business. In March of 1980, when petitioner guaranteed the loan to SSSI, he was practicing medicine on a full-time basis. Medicine was obviously his trade or business, and the loan in no way related to his medical practice. Also at that time petitioner was a primary investor in SSSI. Petitioner has not established that the dominant motive for his guaranty was to protect a trade or business of his own, as distinct from his investment in the business of the corporation. It was not until 2 months later that petitioner terminated his medical practice to become involved in the day-to-day activities of SSSI. However, to determine whether a guaranty had a proximate relationship to the taxpayer's trade or business, we focus on the dominant motivation at the time the guaranty was made, not at the time the guaranty is paid. *355 Even if we looked to the latter date, it would not aid petitioner, who returned to his medical practice full time in the middle of 1982, a year before he made good on any part of the guaranty. The record as a whole demonstrates that petitioner was an investor in SSSI who had become heavily involved in the company financially. His motivation in guaranteeing the loan was to protect his investment in the company, and to enable SSSI to fulfill its obligations. Accordingly, the debt was not created or acquired in connection with petitioner's trade or business. In support of his claim to a business bad debt deduction, petitioner argues that he planned to leave his medical practice at the time he signed the guaranty and that his dominant motivation when he guaranteed the loan was to protect his expectation of earning a large salary. Although protecting potential salary may serve a legitimate business purpose, Putoma Corp. v. Commissioner, supra at 674, petitioner presented no evidence, testimonial or otherwise, with respect to his expectation or anticipation of future salary, the amount thereof, or when he might expect to begin receiving it. See *356 Stoody v. Commissioner, 66 T.C. 710 (1976). Rather, he explained his lack of salary only by relying on the Small Business Administration (SBA) provision, which stated that only Makeever would receive a salary until the loan was paid off. However, petitioner and Makeever themselves advised the SBA that only Makeever would receive a salary, and it appears to us that had petitioner desired to receive a salary, even a nominal one, he was not "precluded" as he contends, by the SBA. Moreover, we consider objective factors at the time the guaranty was made, not the subjective intent of the taxpayer. The chance that petitioner might become an employee of SSSI in the future does not persuade us that his dominant motivation at that time was to protect potential salary and not to protect his investment in SSSI. Accordingly, because petitioner did not guaranty the loan in connection with his trade or business, we hold that he may not deduct his payment of the guaranty as a business bad debt for the taxable year 1983. Nevertheless, on brief, petitioner asserts that the outcome of this case is dictated by Lundgren v. Commissioner, 376 F.2d 623 (9th Cir. 1967), *357 revg. T.C. Memo. 1965-314, which, according to petitioner, requires us to find that he was "engaged in the trade or business of being an employee of SSSI". See Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Petitioner misstates the exact holding of the Ninth Circuit in Lundgren as one which allowed the taxpayer to claim a business bad debt deduction when he fulfilled a personal guaranty on a SBA loan. In fact, the loan for which the taxpayer made a personal guaranty was paid in full by the proceeds of an insurance policy. The bad debt in question concerned cash advances made by the taxpayer to a corporation in which he held about 60 percent of the stock. The Tax Court held that the taxpayer was not engaged in a trade or business in connection with the corporation and therefore was not entitled to claim a business bad debt deduction for advances to that corporation. Lundgren v. Commissioner, T.C. Memo. 1965-314. The Court of Appeals reversed, stating that The facts of this case support petitioner's contention that his investment *358 in RushMore was motivated in the first instance by expectation of gain from sales of timber to the corporation at a profit, a gain arising from the business of selling timber, and not from * * * [the] business of RushMore itself. * * *
Id., 376 F.2d at 628. As a result, the taxpayer's advances were held to be proximately related to his trade or business, that of selling timber. As the Court of Appeals for the Ninth Circuit held in Lundgren, the taxpayer proved that he planned to derive a profit from selling timber to the corporation, in addition to receiving salary for services rendered the corporation; the fact that these anticipated benefits never materialized did not mean that the taxpayer was not engaged in a trade or business. Id. at 629. The Lundgren case is distinguishable from the instant case. First, petitioner has not proved that he expected to make a profit from selling any goods or products of his own to SSSI. His chief motivation for the guaranty was instead to protect his investment in SSSI. See Jerich v. Commissioner, T.C. Memo. 1992-136. Second, petitioner *359 has given us no persuasive evidence to conclude that he anticipated that he would earn a salary from SSSI or, as he contends on brief, that the salary would be substantial. In fact, at trial, he presented no evidence with respect to salary other than the fact that he did not receive a salary. Accordingly, petitioner is not entitled to a business bad debt deduction with respect to his loan guaranty. Petitioner is entitled, however, to a nonbusiness bad debt deduction in the taxable year 1983. [7]
*360 II. Negligence. Section 6653(a)(1) imposes an addition to tax if any portion of an underpayment is due to negligence or intentional disregard of the rules or regulations. Section 6653(a)(2) provides for an addition to tax in an amount equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence. Negligence under section 6653(a) is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioner bears the burden of proving that he was not negligent in claiming a business bad debt deduction or the Soda Lake loss. He has already conceded such liability for the Petro West loss. Petitioner did not present any evidence to refute respondent's determination of negligence, and, accordingly, we hold that all of the underpayment was due to negligence. III. Substantial Understatement. Section 6661 provides that a taxpayer whose income tax return contains a substantial understatement of tax may be liable for an addition to tax equal to 25 percent of the underpayment attributable to such *361 understatement. Pallottini v. Commissioner, 90 T.C. 498 (1988). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Woods v. Commissioner, 91 T.C. 88, 95 (1988). However, the amount of the understatement taken into account under section 6661 can be reduced if there is substantial authority for the tax treatment of the item at issue, or if the taxpayer adequately disclosed the tax treatment of the item on his return. Sec. 6661(b)(2)(B). In addition, the Secretary may waive any or all of the addition to tax if the taxpayer shows that there was reasonable cause for the understatement and that the taxpayer acted in good faith. Sec. 6661(c). A. Bad Debt Deduction. Although petitioner claimed on brief that he possessed "substantial authority, based on the law and facts, for claiming the business bad debt deduction", he presented nothing to refute respondent's determination that he was liable for an addition to tax for the substantial understatement of income tax attributable to that deduction. Accordingly, we hold for respondent on this *362 issue. B. Soda Lake. Petitioner contends that because he conceded the Soda Lake mining loss, respondent is precluded from asserting an addition to tax under section 6661 relating to this loss. In support thereof, he cites Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408; McCrary v. Commissioner, 92 T.C. 827 (1989); Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988). In Todd, this Court held that, for purposes of section 6659, an underpayment of tax was not attributable to a taxpayer's overvaluation of his investment in containers, because the taxpayer conceded that the containers were not placed in service during the years in issue. As a result, there was no allowable deduction that could have been overvalued. Similarly, in McCrary, the Tax Court held that where taxpayers conceded prior to trial that they were not entitled to an investment tax credit because an agreement was a license rather than a lease, section 6659 was inapplicable because the underpayment was *363 not attributable to a valuation overstatement. We note that respondent has not determined an addition to tax under section 6659 in this case. In Heasley v. Commissioner, supra, the Court of Appeals for the Fifth Circuit held that the Internal Revenue Service abused its discretion by failing to waive the section 6661 addition to tax because the taxpayers showed reasonable cause and good faith when evaluating their proper tax liability. Here petitioner has not shown either reasonable cause or good faith. Section 6661 applies when there is a substantial understatement of income tax for any taxable year. Petitioner's attempt to analogize section 6659's valuation overstatement in Todd v. Commissioner, supra, and McCrary v. Commissioner, supra, to section 6661 is without merit. Under section 6661, we are not faced with determining whether an understatement is "attributable to" a valuation overstatement. Our threshold inquiry is simply whether a substantial understatement of income tax exists. Petitioner agrees that he substantially understated his income tax by virtue of his *364 concession that he was not entitled to claim the Petro West mining loss or the Soda Lake loss. These concessions alone do not serve to alleviate the section 6661 addition to tax. See Mailman v. Commissioner, 91 T.C. 1079 (1988). There is no substantial authority for petitioner's claimed losses, and he presented no evidence of reasonable cause or good faith. Therefore, petitioner is liable for the addition to tax under section 6661 due to a substantial understatement of income tax. C. Legislative Intent. Nevertheless, petitioner argues that he ought to be relieved of liability for the addition to tax for a substantial understatement, as well as the addition to tax for negligence, because he has eased the burden on the Court's docket by conceding the deficiency in tax. Petitioner argues, with copious citations to legislative history, that these additions to tax were enacted to improve the Tax Court's ability to control its docket. See Staff of Joint Comm. on Taxation, General Explanation of the Economic Recovery Tax Act of 1981, at 332-335 (J. Comm. Print 1981) (sec. 6659); id. at 336-337 (sec. 6653(a)(2)); H. Conf. Rept. 97-760 (1982), *365 1982-2 C.B. 600, 649-651 (sec. 6651); H. Conf. Rept. 98-861 (1984), 1984-3 C.B. (Vol. 2) 1, 239 (sec. 6621(c)). He argues, therefore, that by conceding the deficiency he has eased the burden of the Tax Court's docket and thus should not be penalized under those sections of the Code enacted for the purpose of controlling the Court's docket. We rejected this argument in Cramer v. Commissioner, 101 T.C. 225, 257-259 (1993), where we noted that the statutory language does not preclude the simultaneous assessment of these two additions to tax. In Cramer, having found "no unequivocal evidence of contrary congressional intent", we held that the taxpayers were liable for the additions to tax under both section 6653(a) and section 6661. Id. Here petitioner has not cited any legislative authority stating (or even implying) that both these additions to tax cannot be imposed simultaneously. Consequently, we hold that the additions to tax under sections 6653(a) and 6661 may both be imposed even in a case, such as this one, where the petitioner concedes the deficiency in tax. Neither Todd v. Commissioner, supra, *366 nor McCrary v. Commissioner, supra, stands for the broad proposition that a concession of a deficiency relieves a taxpayer of liability for either or both of these additions to tax. Petitioner's argument is without merit. IV. Increased Interest.
Section 6621(c), formerly section 6621(d), provides for an increased interest rate with respect to any "substantial underpayment" (greater than $ 1,000) in any taxable year attributable to a tax-motivated transaction. The increased rate applies to interest accrued after December 31, 1984, even though the transaction was entered into prior to the date section 6621(c) was enacted. Solowiejczyk v. Commissioner, 85 T.C. 552, 556 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). The term tax-motivated transaction includes a transaction where any loss was disallowed by reason of section 465(a) or a transaction that is devoid of economic substance and without a profit objective. Sec. 6621(c)(3); Larsen v. Commissioner, 89 T.C. 1229 (1987), affd. in part and revd. in part sub nom. Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990). *367 Petitioner has conceded liability under section 6621(c) for his Petro West mining claims. However, he contends that because he conceded the Soda Lake mining loss, respondent is precluded from asserting any increased interest relating to that loss. Once again, petitioner's concession argument is meritless. Respondent determined that petitioner was liable for increased interest because the Soda Lake mining loss was predominantly attributable to a tax-motivated transaction. Petitioner conceded this loss, but provided the Court with no evidence that the underpayment arising from this concession was not attributable to a tax-motivated transaction. Therefore, in these particular circumstances, we sustain respondent's determination with respect to increased interest on the Soda Lake mining loss. Cf. Irom v. Commissioner, 866 F.2d 545 (2d Cir. 1989), vacating in part and remanding T.C. Memo. 1988-211; Schachter v. Commissioner, T.C. Memo. 1994-273. However, we hold that petitioner is not liable for increased interest on the bad debt deduction issue. To reflect the foregoing, Decision will *368 be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. 50 percent of the interest due on the deficiency.↩
2. The annual rate of interest under sec. 6621(c)↩ is 120 percent of the interest payable under sec. 6601 with respect to any substantial underpayment attributable to a tax-motivated transaction.
2. At trial, petitioner also conceded a statute of limitations issue that he raised in his petition.↩
3. Prior to petitioner's involvement in SAV Solar Systems, it appears from the record that SAV was doing business either at, for, or under the name of Elixir Industries, Inc.↩
4. Apparently petitioner loaned SAV Solar Systems $ 10,000 prior to incorporation and had not been repaid at the time of incorporation. As a result, the articles of incorporation stated "cancellation of indebtedness" as the type of consideration that petitioner paid for his stock.↩
5. On February 2, 1981, SSSI changed its name to Enray.↩
6. Respondent did not allow any deduction of this amount in the notice of deficiency.↩
7. Petitioner argues that in addition to the nonbusiness bad debt deduction in 1983, this Court has jurisdiction to allow him nonbusiness bad debt deductions for the taxable years 1984-92. This Court's jurisdiction is statutory, and, unless a proper notice of deficiency is issued and a petition is timely filed, the Court has no jurisdiction to consider a case. Estate of Moffat v. Commissioner, 46 T.C. 499, 501↩ (1966). There is no petition before this Court regarding the later years, and we have no knowledge that petitioner has received a notice of deficiency for those years. Accordingly, we lack jurisdiction over those years. None of the cases cited by petitioner are applicable here.